UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


UNITED STATES OF AMERICA        )
                                )
vs.                             ) No. 3:24-CR-151
                                )
MATTHEW ISAAC KNOOT             )
_____




BEFORE THE HONORABLE ELI J. RICHARDSON, DISTRICT JUDGE

TRANSCRIPT OF PROCEEDINGS HELD TELEPHONICALLY

IN CHAMBERS

JULY 30, 2025




_____

RICHARD DERRICK EHRLICH, RMR, CRR
Official Court Reporter
719 Church Street, Suite 2300
Nashville, TN 37203
(219) 682-8691

                              APPEARANCES:


FOR THE GOVERNMENT:

        JOSHUA A. KURTZMAN, via telephone
        GREGORY JON NICOSIA, JR., via telephone
        U.S. Attorney's Office
        110 Ninth Avenue, S
        Nashville, TN 37203


FOR THE DEFENDANT:

        DAVID KENTRELL FLETCHER, via telephone
        Federal Public Defender's Office
        810 Broadway
        Nashville, TN 37203

The above-styled cause came to be heard on July 30, 2025, before the Hon. Eli J. Richardson, District Judge, when the following proceedings were had at 9:00 a.m., to-wit:

THE COURT:  All right.  We're on the record in United States vs. Matthew Isaac Knoot, Case Number 3:24-CR-151.

We're here for a couple things.  One, I did want to address the pending motion to continue, and we'll probably get to that at the end.  And then we're going to address the motion to suppress, which is at Docket Number 48.

You know, I reached some tentative conclusions.  Theoretically, they could change in response to some answers to questions that I have, although I've certainly, if I might say so, put in a lot of time and have various views about this.  But, again, there are a couple questions I want to ask to sort of finish my analysis, but I plan to announce a decision here during this discussion.

If counsel could make their appearances, please.

MR. NICOSIA:  Good morning, Your Honor. This is Greg Nicosia for the United States.

MR. KURTZMAN:  Good morning, Your Honor. Joshua Kurtzman, also for the United States.

MR. FLETCHER:  Good morning, Your Honor. This is David Fletcher on behalf of Mr. Knoot.

THE COURT:  All right.  Good morning, Counsel.

One of the things I wanted to say was this: Part of the issue to me on the motion to suppress is identifying sort of the precise scope of the arguments being made in support of the motion to suppress.  Issues regarding the particularity requirement are not always easy. I took my best shot after, again, if I might say so, a lot of time and a lot of consideration as to what the arguments were or could be or intended to be.  Those sorts of things.

If at any time anyone thinks that when I say I didn't see a particular kind of argument but they think they made it, please speak up because I do want to hear that.  I've identified some arguments that weren't made, and that's part of my analysis.  Anyone says, Wait a

minute, Judge. I did argue that.

I need to know that, so please let me know. I would be surprised if I miss anything along those lines, but it's always possible.

The next thing I wanted to note is just sort of a preliminary matter before I ask a couple questions. If we look at what I'm going to call the premises warrant, Mr. Knoot calls a device warrant, if you look at it, the way it's written it actually kind of supports both parties' terminology.

If we were to look at Exhibit A to the search warrant -- see what it says. "The property to be searched is located at 1818 Church Street, Apartment 416, which is a fourth floor apartment located in Nashville, Tennessee, and the storage unit assigned to Matthew Knoot, as well as any digital devices within this residence or assigned storage area."

So the Government says, Well, you know, this is really a warrant to search the premises, so we call it a premises warrant.

I get it. But Mr. Knoot is right to note that, sort of separately, orders a -- authorizes

a separate search of any devices that happen to be found on the premises pursuant to the search of the premises.

So, relatedly, if we look at attachment B, the items that can be seized by the Government, you know, there's something sort of circular about a warrant like this. Attachment A says that you can search the premises.

Attachment B tells you what you can seize.

Included among the things that could be seized pursuant to the search of the premises are, quote, cellular telephone SIM cards, prepaid calling cards, and so forth.

And then it says, D, electronic equipment such as computers, personal organizers, personal digital, telex machines, et cetera, et cetera.

The idea being you can search the premises, then pursuant to attachment A, then pursuant to attachment B, you can seize digital devices.

And then back to attachment A, then you are authorized, under the warrant at least, to do a subsequent search of the personal digital devices, all digital devices, including the personal ones.

That's how this works.

Why do I point that out? Well, as regards the challenge to the warrants provisions that are broad enough to cover personal devices, which is, of course, really at the crux of this motion to suppress, there's this aspect, you know, if you're the Defendant, you're noting you don't like that the attachment B authorizes them to be seized pursuant to search of the premises. You don't like that attachment A authorizes a subsequent search of the personal devices.

And then back again to the issue of seizure, you don't like that the warrant authorizes seizure of data that is found pursuant to the secondary search of the personal devices, because that's really, in my view -- like, when the complaint is about, well, this warrant authorizes all this data to be copied under the secondary search of any personal devices, in a sense at least, you're complaining that this retention of data, pursuant to the secondary search of the personal devices, that this retention is, in effect, sort of this

ongoing seizure of data from the secondary search of the personal devices. All this factored into my thinking about what exactly the nature of the complaint was in the motion to suppress.

And I have no doubt that Mr. Fletcher and his side did their best to make this as clear as possible.

I will say that, based on what I just said, there's a certain amount of confusion involved in the situation. And I also will say that -- and there is a certain kind of confusion in the case law about the particularity requirement, which I'm going to get into in a minute.

There are a lot of permutations here of complaints about what's being searched, what's being seized. We got two levels of complains about searches. We got two levels of complaints about seizure. The particularity requirement has -- there are three -- in my view, there are three different kinds of particularity challenges. You can see, and we're going to walk through this a bit, that the permutations involved here are numerous, and that's what

makes the Court's efforts to really say what is really the complaint here more taxing.

So one thing I want to do -- there are a couple specific things I want to focus on now. We have the Discord. Let me back up and say everything that I was just saying only applies, of course, to one of the two challenge warrants. And then, you know, it's talking about the -- what I'll call the premises warrant, even though it is fairly called also a device warrant, because it authorizes searches of both as we just discussed. I'm going to call it the premises warrant.

Then we have the Discord warrant. Of course, part of the claim about -- from the Defendant about the Discord warrant is that it's based on, you know, illegal evidence obtained illegally from the premises warrant, but, of course, it's got its own separate challenges as well based on particularity.

Regarding the particularity challenge to the Discord warrant, I wanted to ask this of the parties, their views on this particular issue. Mr. Knoot's position, and I get it, is that,

look, the information requested from the Discord accounts, both of Mr. Knoot and his alleged co-conspirator, the information requested from those accounts is plenary. It's, like, everything in the account. I mean, what really is excluded? I get that.

The Government's view is different. The Government's view is, actually, this is much more, you know, particularized than, for example, the warrant that was involved in the Middle District of Georgia case upon which Mr. Knoot relies.

And I wanted to, in particular, ask the Government about this.

Here's what the Government says. Reading from Docket Number 52 at pages 24 and 25:

"Here, despite the Defendant's arguments to the contrary, the Discord warrant was sufficiently particular and did not seek access to all data associated with the account; instead, the Discord warrant sought a discrete categories" --

I think the "a" should come out of that sentence.

"Indeed" --

Let me back up.

"Instead, the Discord warrant sought discrete categories of data based on records of saved chats between the Defendant and an unindicted co-conspirator."

One of the things I want to ask the Government. From your perspective, if you look at the Discord warrant and the kind of information that was obtainable under the Discord warrant, what was excluded? Is there a date range that the Government says was excluded? Was there particular kinds of chat that was excluded? Was there particular metadata that was excluded?

So if the Government gets everything that they ask for in the Discord warrant from these accounts, what would be information from the account that would not have been turned over? Are you able to identify anything?

MR. NICOSIA: Good morning, Your Honor. This is Greg Nicosia. Just to make sure I'm understanding your question correctly --

THE COURT: Yeah.

MR. NICOSIA: -- are you asking what would be the appropriate scope for the provider to have turned over or the appropriate scope for us -- the Government to review after having received that date?

I just want to make sure I'm --

THE COURT: Well, I took -- it is a good question. I took Mr. Fletcher to complain about what it asked for, you know, what you get. If you got everything you asked for under the warrant, the complaint is about what you get rather than, you know, how you sift through the information.

I took it to mean that, you know, rather than complain about your ability to sift through the data you got, I think the initial complaint was that the scope of information that was subject to being turned over under the Discord warrant was too broad. I think that was the complaint.

Is that right, Mr. Fletcher?

MR. FLETCHER: Yes, Your Honor.

THE COURT: Okay. So with that, Mr. Nicosia, I'm looking at that -- and there

may be a good answer to that. I'm not suggesting there isn't. But I'm looking at that, and I'm saying, Okay. If the Government gets everything that's within the scope of the warrant, what kind of information would not have been turned over that's relevant to these accounts, that's account information that the Government leaves behind and doesn't get produced?

MR. NICOSIA: Right. Thank you, Your Honor.

MR. KURTZMAN: So --

MR. NICOSIA: Go ahead, Josh.

MR. KURTZMAN: If we can maybe tag team this, Your Honor.

THE COURT: Yeah.

MR. KURTZMAN: I'm looking at it now, and then I'll pass to Mr. Nicosia.

I think it's -- as sort of all of us probably know, the Discord and electronic communications providers like it collect massive amounts of data.

THE COURT: Right.

MR. KURTZMAN: And we don't -- and I'm not

going to pretend that we know absolutely every bit of data that they do have.

THE COURT: Yeah.

MR. KURTZMAN: You know, does Discord take locational data?

Maybe. I'm not sure.

But I think when we talk about how particularly we were in subparagraphs A through G of the Discord warrant, we're asking for sort of things that we suspect that they may have in that we -- and I say "we," the investigative team -- had learned over time that they have and those things that would help us identify the user of those accounts.

And then the only other thing we ask for other than identifying the users were data associated with the criminal activity in question.

THE COURT: Yeah. So let me take that in two phases. One, you make a good point. Like, we often think of the -- one of the things a search warrant can do is authorize the gathering of evidence of a crime. Identifying information, it's interesting, it's a little bit

different. It's not really evidence that is evidence of a crime. It is evidence that helps you identify by who may have committed the crime, but it's actually something different.

But I think it's fair to say that a warrant that asks for information regarding -- you know, that's relevant to who committed a crime is a proper thing to ask for in a warrant. To the extent that the Discord warrant is asking for information that would identify the user of the account, I can see the merit.

Regarding the -- but if you're Mr. Knoot, Mr. Fletcher, what you're saying is, You know what, what was asked for in terms of communications was too broad. It wasn't in any way limited to the crimes at issue.

One possible comeback is, Well, you know what? We don't know, and certainly Discord can't sort of filter on the front end messages to only those that were involved in the crimes.

You kind of -- as an investigator, you would have to, sort of, know what you're looking for to know which particular chats were in furtherance of this criminal activity. And with

that being the case, therefore, you can't specify it any more than the Government did in the warrant here.

Is that something the Government is saying?

MR. KURTZMAN:  I think that's fair, Your Honor.  I think the warrant, the Discord warrant specifically, articulates the Government's knowledge of the use of the messaging portion of that platform to further the criminal enterprise that we were investigating.  And it asks -- after we get through the identity piece, it asks for messages understanding that the provider, like you said, can't go through them -- go through those messages themselves and delineate incriminating versus non-incriminating.

So we said we know the messaging portion of this platform -- of their platform for these accounts is being used to further criminal conduct and asked under the (indiscernible) for the ability to see those messages and to review them.

THE COURT:  So one of the, I think, governing principle were a little clearer on

this.  I get this from one or both of these two cases.  Well, I think the -- I think the case, actually, is going to be U.S. vs. Greene, G-R-E-E-N-E, 250 F.3d. 471 at 477.  Particularity needs to be as specific as the circumstances and activity under investigation permit.

And, you know, sort of the requirement regarding particularity is case-specific.  One of the things that you would say is, Look, under the circumstances, we can't, you know, really be more particular as to what discussions should be produced under these circumstances.

Is that fair to say?

MR. NICOSIA:  Yes, Your Honor, fair to say.

And just to add on to what my colleague had mentioned.  What we're asking for in attachment A is, in our view, what is sufficient and particular to find information, for example, like indicia of occupancy.  You know, all aspects of the account from the moment the registration and the data that (indiscernible) that to the services that are used and some messages that are sent both inform us as to who

(indiscernible) being used. And as I think the -- you know, the investigation here makes clear, at the time this warrant is being issued, we are still in the process of identifying, for example, co-conspirators.

The other thing, Your Honor, I would add just to answer your initial question are things that the warrant, you know, for example, did not seek. Discord offers a range of different services, you know, private server hosting on what they call bots, which are an automated service you can have to communicate with folks in your group and channel, so on and so forth. Those aren't, in my view anyway, particularly responsive, and I don't read attachment A to ask for those or seek those items.

There's certainly a range of other information that Discord does have and we did not ask for here, and I don't see any way -- at least I think here today we can use.

I just wanted to be responsive to your initial question.

THE COURT: No. That's helpful. And, of course, none of that -- none of what you said is

of record, but -- and so I can't rely on them in that sense, but I do think it's consistent with a notion that I have, which is at the very least, I can't say -- I can't say that the Government requested everything in the account, you know, because the Government asserts -- and I have really no reason to disagree that there very well may be other kinds of information, and you just listed some. But I certainly can't say that, you know, unlike apparently the Middle District of Georgia case, that it was all -- every sort of kind of information possible available from the account was asked for.

I'm going to allow Mr. Fletcher to say anything he wants about this particular piece of the analysis in a minute, but the one thing I did want to ask was this. You know, if you're Mr. Knoot or Mr. Fletcher, you might say, Well, you know, at the very least, you could've put a reasonable date range on this.

What would be your response to that? Like, a date range to the -- either the identifying information or, probably perhaps more pertinently, the communications?

MR. NICOSIA:  Your Honor, I think that a date range could be appropriate.  Here, we're seeking data of account inception through the date the warrant was issued, again, because we are looking for that account creation information that is important to determine, again, you know, what is sort of an analog to be called (indiscernible), who actually owns that account, how is it being used, how is it registered, so on and so forth.

So I do think that speaking, as we did here, from date of account creation up to the date of the warrant was appropriate.

You know, that being said, there is a universe in which I could imagine that tailoring would be appropriate, but I don't know that is an appropriate case to do it.

THE COURT:  All right.  Let me ask you this:  Would you agree that's sort of the remedy for an overbroad warrant?

Let's just say hypothetically the Court says, Well, the request for some of the information maybe is a little overbroad, even if only in terms of the date range.  If I was to

make that finding, the remedy would be to exclude, to suppress information from what I'll call the -- what would be a good term for it? Like, the part of a warrant that -- the part of the warrant that covers something that shouldn't have been requested. Maybe I'll call it the overbroad part.

So the overbroad part of the request here, let's say, would be a date range that precedes the time period which during the Government has information indicating the crimes occurred. So we call those earlier time periods the overbroad part of the warrant.

Is the remedy to exclude information from the overbroad part of the warrant? Is that the remedy, the suppression remedy that a Defendant has?

MR. NICOSIA: Your Honor, I think that if you were to make that finding, suppression may be an appropriate remedy, though I think we would want to have a further conversation about what is appropriate under the good faith, you know, standard.

THE COURT: Well, yeah. There would be --

yeah. There would be the Leon issue. But let's say, for whatever reason, I'm like, Oh, there's -- if I was to say there's overbreadth, and Leon doesn't apply. If I theoretically was to say that, the remedy would be suppression of information from the overbroad aspects of the warrant. Would you agree with that?

MR. NICOSIA: Well, Your Honor, I think that those potentially overbroad portions can and should be severed from the warrant so that the -- of course, the rest of the warrant would remain and the information thereto would remain valid and in play.

Again, I suppose, put in the awkward position of conceding that, suppression under that hypothetical would be appropriate.

THE COURT: Yeah. Yeah. Of course, just talking hypotheticals.

MR. KURTZMAN: Your Honor, this is Josh. In a hypothetical, I could see that.

I think Mr. Nicosia and I probably have a hard time transposing that hypothetical to here, but I could -- I thought of an example in this instance where your remedy would be appropriate,

or the suppression of the overbreadth would be appropriate. I don't know that it applies here.

THE COURT: Right.

MR. KURTZMAN: But say, for instance, the search warrant in this -- what we call the premises warrant or the device warrant, that was executed on August 8th of 2023. We did not seek the Discord warrant for a period of time after that.

THE COURT: Yep.

MR. KURTZMAN: Mr. Knoot may have seized all of his alleged criminal activity when that premises warrant happened and said, Boy, I better, you know, straighten up and fly right.

And so say he stopped using his Discord account some time after that.

That period of time, between when he stopped using that Discord account to the time the Discord warrant was sought, there could be an idea that that period could get caught in that overbreadth analysis.

I don't think that's the case here, but I think if there were facts supporting that, that that would be an example of where the Court

could come in and say, Hey, hey, hey. You got it to this date. But beyond that date, I think you're overbroad.

THE COURT: All right. Thanks for that.

MR. KURTZMAN: Is that what you're getting at?

THE COURT: Yeah, something like that. Or let's say the Discord account had been in use for 10 years, you know, and then no indication anywhere that 10 years ago, you know, that the user of the account would've been involved in criminal activity. There's no PC as to -- going back that far and whatever.

Well, then, you get to -- you know, potentially a suppression remedy of the older information, but here's where I was going with this and just be -- and I ask this not only for interest in this case but for general interest. Is that a remedy that gives a Defendant any more of a remedy than the remedy you already have under Rule 403?

Because, like -- well, at least in many instances, you would have the same remedy as a Defendant under 403.

Hey, you got all this stuff from this irrelevant period, you know, you can't introduce it. The reason why it's an irrelevant period is there's no relevant information. So if you're introducing evidence from the overbroad part of the warrant from that irrelevant time period, it's excludable under 403 anyway.

Does that make sense?

MR. KURTZMAN: It does, Your Honor, but I think the suppression remedy is broader and more protective for folks like Mr. Knoot. Say, for instance, in the Court's hypothetical, the account went back 10 years. Say there was something before this alleged criminal conspiracy, right, like, completely unrelated to the scheme that the Government has alleged. Say there was evidence of another crime that predated this alleged criminal conspiracy by a year or two.

THE COURT: Yep.

MR. KURTZMAN: The suppression remedy there would be incredibly important for Mr. Knoot and would be broader than his 403 remedy just in that sort of current matter.

THE COURT: Yeah. I think that that's right, because one of the things I'm going to say later is, I think a lot of times an overbreadth challenge is really a partial challenge based on lack of probable cause. I'm going to talk about that.

So there could be an overbreadth challenge saying, Look, you asked for too much considering what your probable cause was. Now it turns out -- so you had no -- in my hypothetical, you had no probable cause for a period after -- or you had no probable cause as to any activity, any information before, let's say, January 2015; therefore, the warrant is overbroad, and the overbroad portion of the warrant is for the time period before January 2015. But even though you didn't have PC as to criminal activity in that prior period, what you received did show criminal activity that otherwise might be admissible in this trial prior to January of 2015.

403 wouldn't keep out that information but a suppression remedy could.

Does that make sense?

MR. NICOSIA:  Yes, Your Honor.

THE COURT:  Yep.  Okay.  Okay.

As for what we talked about, Mr. Fletcher, anything that you would like to say?

MR. FLETCHER:  Your Honor, I guess I go back to your original question, which I understood to mean you asked the Government, you know, what would they have not gotten based on what they asked for?

And I think that we are -- this is a policy that, you know -- (indiscernible) the Government is a large reason why the warrant could've been more particular, because there were things that -- and it doesn't ask for essentially everything.

If you go to attachment B, it specifically states, like, all this stuff -- there's no limiting language in any of -- in any portion of the warrant.  It asks for everything.

And just to get to where -- you just talked about the proper remedy, you know, outside of 403 is the Government, for argument sake, found evidence of stuff that happened 10 years ago or 5 years ago, or months before what they sought,

which, you know, obviously, you know, our point is that the only way they were able to get the -- or even request the (indiscernible) chat is from a -- it appears it's from a screenshot of messages between Mr. Knoot and whoever Yang Xi is.

(Indiscernible), and I think that Mr. Knoot, if there was any information that was found that would show criminal conduct prior to that, I think he would still be in the same position and he would still have the same argument, because the Government (indiscernible) asked for all of that, and you still be saying it's not particular enough because they don't need the amount of information they asked for. They just asked for everything the same.

So you asked them what would they have not gotten? They likely can't have an answer to that because they didn't limit the request. They just asked for everything, so they would've gotten everything no matter the days, no matter the time, no matter what they saw in conduct.

I understand what you're saying, Your Honor. That's kind of my position on this

portion of the warrant.

THE COURT: Well, I think one of the things Mr. Nicosia is saying, Look, we asked for only particular categories of information. There were other categories of information that you could've asked for from Discord. And I think I don't have a basis for saying that there were no other categories; that the Government asked for every category of information.

But your argument, though, would be, like, Okay. But with respect to the particular categories of information, Government, that you did ask for, there's nothing there to limit your request for those categories of information to things that, you know, relate to the crime. Nothing to sort of tailor it to the criminal activity involved here as to each specific category of information; is that right?

MR. FLETCHER: Yes, Your Honor. Even if you look at the particular (indiscernible), you know, subsection B asks for all (indiscernible) --

(Court reporter clarification.)

MR. FLETCHER: I was saying that even if

you look at the part where it says particular things can be searched and seized, subsection B says, All paths and current user names associated with the account.

That in and of itself, amongst other things listed, it seems to actually weigh more than what they know to be looking for at this point.

I think that there could've been some kind of limiting language regarding what they knew at the time, which was they had a printout of conversations between who they thought to be Matthew Knoot and who they thought to be Yang Xi.

There were dates on those. And, obviously, I'm not saying that you have to start at that one particular date, but the way it just asks for everything, so it does seem kind of like a fishing expedition to see what all -- I mean, I'm not in IT. I don't think the Government is. So it makes sense to ask for as much as you can get. They probably aren't asking for -- they probably aren't limiting because they don't know what to limit, but it appears they're asking for every single thing associated with this account,

and I just don't think that that's particular based on information that they had.

THE COURT: Okay. All right. Thank you, Mr. Fletcher. Hold that thought.

Okay. Something else before I get into this analysis a bit.

I want to ask about Defendant's assertion. Defendant's assertion in its reply brief, Docket Number 55 at page 4. And here's what the Defendant writes:

I'm going to leave out references to citations and quotation marks, but Docket Number 55, starting at the bottom of page 3, actually going into page 4, Defendant writes:

"Nor does the allegation in paragraph 17 indicate that a co-conspirator, located somewhere other than Nashville, was accessing V1's laptop. Quite the contrary. The affidavit expressly provides that, as it relates to this application, a VPN can be used to make internet traffic appear as if it's coming from another location. And if anything, this attestation shows that law enforcement believed that a single person was using a VPN on victim one's

laptop to make it appear as though he or she was somewhere other than he actually was, not that that person was using a VPN to allow a third party to remotely access victim one's laptop."

Then a footnote is dropped and says, "For a basic overview of how VPNs work, see" -- and then there's a cite to a Nova University School of Law review article.

You know, in my view, I wondered whether the Government would say that that's inaccurate and it's not how a VPN works, and that the affidavit did not suggest that that's what's going on.

In particular, I wonder, you know, if the Government would say -- and I did some research on this, that actually the reference to a VPN would be an assertion that someone used a VPN to have remote access into a computer on Church Street in Nashville and make it -- you're able to remotely use that computer as if you were using it from Church Street in Nashville.

Do I have that right, Mr. Nicosia?

MR. NICOSIA:  Your Honor, you certainly -- the purpose of the VPN, among other things, is

to provide an encrypted tunnel to have traffic to go from one device to another device. It can be used for a variety of schemes.

Within the context of this scheme, I would certainly agree with you that the purpose of using a VPN is so that it appears that an individual is accessing victim company devices from Nashville when, in fact, their true location is from oversees, and in particular, as discussed in the responses here, China-based on Chinese-based IP addresses.

So I would agree with your characterization. I would just say that, you know, the proof of use of the VPN is not necessarily to remote in. There's additional software, you know, additional applications that are, sort of, required to facilitate that.

But your overall understanding of the purpose here of a VPN is to facilitate the remote access to these devices, I would agree with that characterization, yes.

THE COURT: Okay. All right. Thank you.

So I'm going to read the language from paragraph 17, Mr. Fletcher, and make a comment

on it and ask you about it.  Paragraph 17 says: "Victim 1 identified its employee as" -- then there's the name of the victim -- "A.M., who had provided them with personally identifiable information, including a Social Security number as part of the hiring/onboarding process.

"A.M. also provided victim one with a home and mailing address of 1818 Church Street, Apartment 103, in Nashville, Tennessee.

"Victim 1" -- that's the company, right? -- "reported that A.M., while working with his company issued laptop, was using a VPN to connect to Chinese internet protocol addresses, which would be unnecessary and strange for his position at the company."

And the -- you know, and I think you're -- the point that you're trying to make there is, Hey, if that language says anything, it doesn't say anything about -- to suggest -- it doesn't say anything to suggest that someone elsewhere was using a VPN to connect into the company issued laptop.  It doesn't indicate that.

Is that your position?

MR. FLETCHER:  Yes, Your Honor.

THE COURT: Okay. All right. So we've had the discussion about how a VPN can work under some circumstances. It can be used to access a particular computer located in place X from Y. You can be in Y and use a VPN to access a laptop physically located at X.

Is this language, Mr. Nicosia, at least amenable to the interpretation that that's what this is saying? Again, the languages is that victim 1 reported that A.M., while working with his company issued laptop, was using a VPN to connect to a Chinese IP address.

Let me start that again.

"Victim 1 reported that A.M., while working with his company issued laptop, was using a VPN to connect to Chinese IP addresses, which would be unnecessary and strange for his position at the company."

Is that amenable from the magistrate judge's eyes to this notion that this could suggest that someone is using a VPN from China to access the company issued laptop as it sits there in Nashville?

MR. NICOSIA: Yes, Your Honor, it's

certainly amenable to that interpretation, and that's how I read it as well.

THE COURT: Yeah. Okay. All right. All right.

So, Mr. Fletcher, do you disagree with that?

MR. FLETCHER: No, Your Honor.

THE COURT: Okay. All right. Okay.

Now, let's -- kind of the end of questioning. I wanted to start by talking about the premises warrant and walk through the analysis as I see it.

As I indicated, this is something that authorizes a search of the apartment, seizure -- for our relevant purposes here -- seizure of all personal -- all devices. Let's say -- that's the term I'll use, "all devices," meaning all computers, really. You know, other things, too. But for our purposes, all devices means all computers, laptop or otherwise. And all personal devices means all devices that are not company issued.

So what the premises warrant authorizes is searching the apartment for all devices,

including personal devices.

Then it, in turn, authorizes the search of all devices, including all personal devices for data that is within the scope of attachment B of what I'll call the premises warrant.

Anyone disagree with how the warrant works? Okay.

MR. FLETCHER: No, Your Honor.

THE COURT: All right. Thank you.

One final point. I think we're agreed on this, which is that, you know, it does authorize retention of whatever data from the device is, including the personal devices that the Government, in its discretion, feels that it wishes to retain and make copies of. The warrant itself -- does the warrant itself contain any limitation on that, Mr. Kurtzman? Mr. Nicosia?

Does it impliedly say, Well, you can't -- after searching for data, you can't retain any data. You can't make copies of it. You can't wave it around back at the office if it's not within the scope of attachment B to the premises warrant.

MR. NICOSIA: Yes, Your Honor. I would agree with that framing. And, you know, this isn't a (indiscernible) before the Court, but that is exactly what happened here.

You know, there are -- there's an inventory list that this was produced in discovery. There was inventory listed all the items that initially were discovered at the home, and that is a bigger list than what the FBI actually seized and provided a property receipt. So that is exactly the policy and practice that was adhered to hereupon, you know, looking through the devices to determine what would, in fact, be responses. That's the only devices. There are other physical evidence that was collected, and then that similarly, upon actually inspecting and reviewing those devices, that same logic and limitation would apply.

THE COURT: Okay. All right. And would you agree that -- well, let me put it this way. And I'm not attaching any particular importance to the answer to this question, but I would like to know the answer. Would it be fair to say that, you know, if the Government was to retain

from its search of personal devices information that doesn't relate to crimes, you know, and make copies of it, let's say, that may be the kind of thing that, you know, Americans don't like. They don't like sort of over-intrusive Government actions, but it's probably not something that's going to jeopardize Mr. Knoot's position at trial.

So, in other words, if the issue is suppression at trial, to the extent the Government did something wrong in sort of over-copying stuff, you know, that's not going to hurt Mr. Knoot at trial, which I think is the Court's primary concern, that he not be jeopardized at trial rather than sort of have his rights violated, you know, in a Bivens Fourth Amendment cause of action for a violation of Fourth Amendment.

The over-copying or retention of stuff that's irrelevant, let's say with, you know, sort of personal stuff, if that gets copied, he doesn't really need a suppression remedy because the Government is not going to produce at trial any -- not going to adduce at trial any

irrelevant information anyway. So it's not as relevant to a suppression remedy anyway, is it?

MR. NICOSIA: No, Your Honor. I would agree with your characterization. The fact that that information would not be relevant, it would not go to any of our proofs at trial, would suggest that we would not seek to admit it in the first instance. And that if, for whatever reason, we did, I think Mr. Fletcher would have a very solid argument as to why that irrelevant information is, in fact, relevant.

THE COURT: Okay. So, Mr. Fletcher, you can see what I'm, sort of -- with that line of questioning sort of getting at. And we'll talk about whether, you know, I find a problem with the warrant. And, if so, whether a good faith exception takes the problem away and so forth.

But in terms of -- you know, to the extent there's something wrong under the Fourth Amendment, and a good faith exception doesn't cure it, because of an over-copying of retention of personal data has nothing to do with this case, it's probably not going to hurt you at trial anyway. And if it does, then you would

have a Rule 403 remedy anyway.

Would you agree with that?

MR. FLETCHER: Yes, Your Honor, I would agree with you. But I guess my thought process behind it would be, you know, that just allows the Government to get out of not being particular (indiscernible) to just say, that, well, you know, you do have your full (indiscernible) objections that you can make at trial.

And so it kind of gets away from the need to be particular, but I really don't have more to say than that.

THE COURT: Okay. Yeah. And I do see your point, which is, like, Yeah. Okay. Maybe when we get to trial wouldn't need a remedy, but the Court needs to adjudicate my claim that there should be a suppression order before we even reach that, and here's why. And the Court needs to address that claim.

So I do understand that, but the -- you know, the reason I'm asking that is not so much that, Well, it doesn't really matter if there's a problematic warrant, and if the good

faith exception doesn't apply because, you know, Defendant isn't going to be prejudiced anyway.

I do want to be clear, that wasn't what I was saying, but it was helping me think about, sort of, the nature of the problem -- that helps me think about the nature of the problem that the Defendant is asserting about, sort of, over-retention of data that the Defendant is allowed to complain about even if the Court rejects the argument that, you know, a search could not have been done so that all the data could've been looked at to see if it is responsive.

There is the separate argument, Well, yeah. Okay. You're allowed -- let's assume that the Government is allowed to search through every file because they don't know where relevant information could be.

There is the separate argument about, you know, retention sort of constituting -- even if the search is okay under the Fourth Amendment, I think the argument is that the Fourth Amendment also, sort of, prohibits unreasonable seizure.

And, you know, to the extent there's over-collection retention of information that was looked at in the search, you know, you could have a claim there, and I get that. But I did want to, sort of, explore what that remedy would look like compared to other remedies.

Okay. Here's how I view the challenges here made by the Defendant. You know, if someone disagrees about whether they made an argument, by all means, please let me know. But if you do that, I think it would behoove you to tell me where you made a particular argument.

The premises warrant, the challenge is made as follows: Here's what's said in the first page of motion to suppress. It says that the premises warrant is defective because it allowed law enforcement to review and make copies of all data found on any device discovered in Knoot's apartment irrespective of whether the device or the data has or had anything to do with the crimes under investigation; a particularity problem.

And, two, the affidavit submitted in support of it lacks case-specific facts

demonstrating why law enforcement expected to find evidence on Knoot's personal devices, i.e., a nexus problem.

Here's what I want to suggest, that we need to identify in some detail the precise nature of the particularity problem that's being asserted here. In this regard, I wanted to note what the Sixth Circuit said in United States vs. Richards, 659 F.3d. 527. And this is a case where I won't bother to do quotes and citations, but, otherwise, I'll read here from page 537: "The cases on particularity are actually concerned with at least two rather different problems. One is whether the warrant supplies enough information to guide and control the agent's judgment in selecting what to take, and the other is whether the category, as specified, is too broad in the sense that it includes items that should not be seized."

So the first problem, whether the warrant supplied enough information to guide and control the agent's judgment in selecting what to take.

Now, I submit to counsel, and I'm finding that the particularity of problem asserted here

is not that. There's no question that the warrant makes clear, in relevant part, what can be taken here. You know, it's -- you know, it's all computer equipment. It's all personal devices. I don't think anyone disputes that, you know, the warrant makes clear -- and any agent can figure out looking at a personal device whether it's within the scope of the warrant. That's to be contrasted in, you know, other cases where the language and the warrant, as applied to something an agent on site is looking at, and it's unclear, Well, does thing that I'm looking at, is that within the scope of the words of the warrant as to what I'm authorized to seize?

That does happen. That's not this case.

The particularity problem as regards to the device warrant instead is this: Whether the category, as specified, is too broad in the sense it includes items that should not be seized.

Now, I want to tell counsel my view of this. "Too broad in the sense that they should not be seized." There are multiple ways in

which that problem can manifest itself, and I want to give a couple of examples that I don't think are the problem that Mr. Knoot is complaining about, and then I'm going to identify the kind of problem I think he is complaining about that falls into that second category of particularity requirement challenges.

A warrant, for example -- suppose in my hypothetical, and a search warrant affidavit makes clear that between 10:31 a.m. and 10:39 a.m., there were particular text messages. And as far as the warrant indicates -- as far as the affidavit indicates is the only time period that's at all relevant to a case. Maybe there are -- you know, in my hypothetical.

By some typographical error, though, the warrant authorizes -- let's say it's, like, a Discord type warrant. You know, you're asking this information from an entity like Discord.

The attachment authorizes seizure, you know, which really means production from Discord of all text messages between 10:31 a.m. and 10:39 p.m.

It's just a typographical error.

Well, that is a situation where the warrant is too broad in that it does include information that should not be included.

How do you know it shouldn't be included?

Well, not even the Government is contending it should've been included.

Under their own theory, it should've been cutoff at 10:39 a.m., and going to 10:39 p.m. is too broad. It includes information that everyone is clear should not have been included.

So you have that kind of example.

You could come up with other examples like that where, for various reasons, yeah, the words are just -- is too broad. It's including stuff that shouldn't have been included.

I think there's another specific category, though, of situations where the warrant is too broad in that it includes information that should not be included, and it's a situation where the probable cause that is advanced via the affidavit is not broad enough to support everything that's within the scope of the items to be seized as stated in the attachment to the

warrant. In other words, the probable cause supports seizing only some of the stuff in attachment B, and not all of it. And that's, I think, the argument here. And I think it dovetails -- it's really the same argument, in my view, as the nexus argument. It really is. It's a particular kind of overbreadth challenge that attachment B allows seizure of things that are too broad in a particular sense.

There's no challenge to the seizure of the company issued laptops. But to the extent the language of -- here's the challenge from the Defendant. The language of attachment B covers all devices, company and personal, it is too broad. And why is it too broad? I think, really, the argument here is there's no probable cause as to personal devices; therefore, since we're all agreed, the language of the attachment B to the warrant authorizes seizure of all personal devices. It's too broad. The overbroad part of the warrant is the part that allows seizure of personal devices in particular. And I think the argument is there's no probable cause to search personal devices,

and that's what makes the warrant overbroad.

I think that this is the same argument as the nexus requirement.

In my view, the nexus requirement is not typically stated this way. But what is a challenge to an affidavit's, you know, failure to meet the nexus requirement to support a warrant?

The challenge really is, is that the affidavit does not establish probable cause that evidence of a crime will be found at a particular location to be searched or, in particular, items to be seized. That's a nexus challenge. It is, in my review -- and for some reason it doesn't seem to be stated this way often -- talking about a nexus challenge. It's a particular kind of probable cause challenge; challenging probable cause that evidence of a crime will be located in a particular place. And here the challenge is there's no nexus between the activity under investigation and personal laptops. That is a nexus challenge with respect to a laptop. It's the same thing.

So I really think that, unless someone is

able to talk me out of it, we have one challenge. It's a challenge -- the particularity challenge and the nexus challenge are the same thing. It's that there's not probable cause to support searching the laptops because there's no probable cause to believe that evidence of the crimes under investigation would be found on the laptops to be seized, and then pursuant to attachment A to be searched thereafter.

Anyone have a disagreement with that part of the analysis?

Okay.

MR. FLETCHER: Your Honor, no. No disagreement between that, Your Honor. I think that really encapsulates just in a more narrow version than what we drafted in the motion to suppress.

I would add that, you know, because we know that there was a live preview, I guess the search of one of the victims of --

THE COURT: Mr. Fletcher, are you able to -- you're sounding kind of muffled.

MR. FLETCHER: Can you hear me better now?

THE COURT: A little bit. That's a little better.

MR. FLETCHER: I'm sorry. The work phone is just not the easiest thing to work with.

But I was making the point that I would add that just -- because we know that there was a live preview of one of the victim laptops at the apartment during the time of the search, that makes the warrant -- it just makes it more overbroad because they were able to see, during the search, what was on the victim's laptop, each one of them during the search.

And even after doing the live preview of the victim laptop, they still (indiscernible) every other laptop, every other device, which included some of Mrs. -- I think her name was Chang, the girlfriend. And, you know, at that point, she wasn't even part of the investigation. But it's so overbroad.

You know, nothing limited -- there's no limiting language in any of -- any portion of the warrant that would've brought (indiscernible) in on what they thought was an instrument of the crime.

THE COURT: All right.

MR. NICOSIA: Your Honor, if I could. Two corrections or things I would like to point out about what Mr. Fletcher commented on there.

First, the comments that Defendant's girlfriend was not part of the investigation at that time.

I don't agree with that. I think we have subsequently ruled her out as a Defendant in this case, but her role in the investigation is absolutely still under investigation at the time of the search.

And, second, with respect to the live preview, I mean, this is not something that's covered in any of the -- you know, the papers that was submitted to the Court. But Mr. Fletcher is correct that the FBI did, in fact, live preview one of the victim company laptops, because when they entered the apartment, the laptop was turned on, logged in, and you could see that somebody was accessing the laptop remotely for devices that were locked or -- and by the way, the user name and password were available on a sticky note on the laptop.

You know, for devices that were not logged in or not able to be accessed at the scene, it would not be immediately apparent to a reasonable FBI agent executing this warrant necessarily, Well, is there or isn't a victim company laptop at that moment.

So I don't necessarily agree with those assertions.

THE COURT: Was there a live preview of any personal computer?

MR. NICOSIA: I do not know the answer to that, Your Honor. I don't believe so, but I'm not certain. So I don't want to be definitive with you one way or the other.

THE COURT: Okay. It seems to me that -- I think the matters raised now by Mr. Fletcher probably don't go towards the merits of the motion to suppress. They may have some other relevance, but on whether the affidavit established probable cause of the nexus is how I view the nexus issue, right. You need probable cause of a nexus. It's often said you need a nexus. I think what you need is probable cause of a nexus. That's a particular standard for

the nexus you need.  I don't think it goes to that.

Am I missing something, Mr. Nicosia?

MR. NICOSIA:  No, Your Honor.

THE COURT:  Okay.  Do you think I'm missing something there, Mr. Fletcher?

MR. FLETCHER:  No, Your Honor.

THE COURT:  Okay.  All right.  So if we look at this, you know, the first thing I want to say is I'm looking for, you know, probable cause in the -- the issue being probable cause in the affidavit of the nexus between the criminal activity under investigation and the laptop.  And I do find -- well, I want to start out by talking about the applicable standard of review.  There are many aspects of the law in this area that are surely, to Mr. Fletcher's chagrin, not really in Defendant's favor.  They just aren't.  It's just the reality.

Let's look at some of the standards on a probable cause determination from a challenge to a warrant, which would include a challenge to nexus.

The Court notes the following:  I'm reading

from the Sixth Circuit en banc opinion in United States vs. Christian, 925 F.3d. 305, reading from page 311:

"Probable cause" -- let me say this again. I'm going to cut out sort of references to quotation marks and citations, but otherwise reading verbatim:

"Probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. Time and again the Supreme Court has emphasized that probable cause is not a high bar to clear.

"Whereas here, a magistrate has issued a search warrant based on probable cause. We do not write on a blank slate, rather, the magistrate's probable cause determination should be paid great deference. And we overturn that decision only if the magistrate arbitrarily exercised his or her authority. We are not permitted to attempt a de novo review of probable cause."

Then later the Sixth Circuit in Christian refers to United States vs. Hines, 885 F.3d. 919, Sixth Circuit, 2018, in which we emphasize

the importance of the totality of the circumstances approach:  Not all search warrant affidavits include the same ingredients.  We said before recognizing that it is the mix that Court's review to decide whether evidence generated from the search may be used or must be suppressed.

So the Court notes the following:  I don't at all begrudge Mr. Fletcher from -- for -- I don't begrudge him his position that the warrant is a little thin on connections, a nexus between the criminal activity under investigation and personal devices.  And if I was making a de novo review, who knows what I would say.  But as great deference that is afforded, it's not something where I can disregard with a magistrate judge's determination here and here. For the following reasons, I do find that I can't -- I find that I cannot say that the magistrate judge here issuing the warrant exercised the authority to find probable cause arbitrarily.  And there's not a whole lot here, but I think that there is enough.

So if we look at some of the information

that's in there -- a big part of what the parties' dispute is, the significance, the weight to be afforded. The Affiant agent's, that is Agent Russeau's (DE 48) reference to his training and experience where, you know, he says things that I do think do advance the ball on probable cause.

I think Mr. Fletcher is correct to note that, you know, this isn't real compelling. This sort of very general statement is not real compelling. And I agree with Mr. Fletcher. It is very general. But I do think that it can go into the mix. It can't be relied on on its own. I think it can go into the mix here that -- and I really do understand Mr. Fletcher's complaints here. You know, Agent Russeau says that, based on his training and experience, you know, he's learned that people suspected of committing identity theft or computer fraud -- and these are things that, by the way, he did have probable cause to believe was being done by occupants of this apartment. But he says his training and experience has taught him that people suspected of committing identity theft or

computer fraud, quote, Use digital devices, end quote, to communicate with co-conspirators.

And then the Defendant notes here -- and I'm reading from Docket Number 48, the communication will be either via text message or phone call.

Then the next thing the Defendant says is the affidavit lacks case-specific facts establishing why Agent Russeau believed that any digital devices might be found in Apartment 416, beyond the company issued laptops, of course. That would contain evidence of crimes under investigation.

I think a couple things. I think the Court is allowed to give, you know, giving great deference to the magistrate and asking whether the magistrate judge exercised her authority voluntarily. I think the notion that the magistrate judge could give some weight to the notion that persons involved in predicate crimes such as existed here, identity theft or computer fraud, used digital devices to communicate with co-conspirators.

Then I think on the issue -- I think

Mr. Fletcher is right. Sort of the evidence of co-conspirators isn't great, but could a magistrate judge find that, you know, there's some possibility of co-conspirators? Well, yes, I think for two reasons: I do think there's -- you know, construing the affidavit in favor of the magistrate judge's conclusion, which I think is required under, sort of, the view of deference in Christian, there could be this notion that something was going on that someone in China was involved with this laptop. The VPN was being used in connection with someone physically located in China.

The way that that sentence that I focused on in my questioning with counsel was written, it's subject to other interpretations as well.

But I think a magistrate judge could imply that someone based with an IP address in China could've been involved. The other thing is the affidavit does make clear that there are two occupants associated with that apartment, and that, you know, brings up the possibility of a co-conspirator that was, you know, in the apartment; that if you're involved in this in an

apartment that, you know, a magistrate judge giving deference could say, Well, you know, maybe the apartment is involved in this.

It's a little speculative, but could the magistrate judge, you know, throw this all into the mix, and instead of sort of knocking down every piece of alleged contribution of probable cause piecemeal look at the whole mix of information and make this determination that there was this nexus to personal devices? I think so.

Now, if you're Mr. Fletcher, I think you make a decent -- you would have some counter-arguments. You know, even if there was a co-conspirator in the apartment, how do you know that any communications regarding these crimes with the co-occupant would've been by computer? I mean, if anything, that would be particularly likely to just communicate in person.

I think that that is true, but construing -- drawing inferences in favor of the magistrate judge's conclusion, the notion that, you know, this is 2024, right? And then people

who -- people who live in our society -- I guess 2023, people who live in our society back in that time, as today, tend to communicate with digital devices. It's not much of a stretch.

The other thing is the reason to support the notion what I think makes it very inferrible that the person would have their own personal digital devices is a magistrate judge having been advised there's reason to believe, from the affidavit, that an occupant of the apartment may have applied for the job in the name of the victim A.M., that such an application very well may have been made on-line. And, you know, by 2023, you know, I think the magistrate judge could say, Well, yeah. Okay. We got some communications of some -- you know, if you're a magistrate judge and a district judge, for example, you do still receive some applications for positions or internships or clerkships by mail, and a magistrate judge could be well aware that, in 2023, there's still some applications going by mail but awful lot of applications for employment such as the ones the affidavit would suggest the occupants of the apartment had

done -- those are being done electronically. And if they were being done electronically, it's a good chance that were done by a personal device rather than by, I don't know, going to the local library and trying to apply for a job from that.

I think it's easily inferrible that there was a reasonable chance that a personal device was used. This is also supported, I think, by something else here --

Standby one moment.

If we look at paragraph 16 of the premises warrant supporting affidavit, there's the notion that, of course, that this person -- the person in the apartment may have used the identity of A.M. to get hired. That's what paragraph 17 indicates.

So you have the person in the apartment getting hired, you know, applying for and hiring under the name of someone else.

And then, although the affidavit isn't really all that clear about the nature of the employment, it does say that, you know, as part of the employment, what the hiring company was

doing was issuing a laptop to the person posing as A.M.

Why is that significant? A magistrate judge -- and I think if the magistrate judge knew more about the nature of the employment than was disclosed in this affidavit, I think, as it turns out, given the nature of the employment, what I'm about to say would be even more likely, but that if someone is hired for a job where a company sees fit as part of their employment to ship them a company laptop, there is reasonably -- the part of the reason they were hired is the kind of person that would work with a laptop, would be comfortable working with a laptop, needs to work with a laptop. Any or all of those. And those persons are especially likely to fall under the category into which most of the persons in society tend to fall into anyway. People that have their own computers.

I think that's inferrible that there's a reasonable probability that anyone has that at this point. A magistrate could make that inference. But it's particularly true with respect to someone who gets hired for a position

where they get shipped a company issued laptop. There's just that much more reason to believe, You know what, this is a person that works with computers.

A magistrate judge easily could say, Someone that uses computers in connection with their work rather than, let's say, being a sanitation worker or something, whatever, they're just especially likely to have their own computers. It's no great leap.

So giving deference to a magistrate, the inference that there would be personal laptops in the apartment was, I think, something a magistrate judge was allowed to do.

As to whether criminal activity would be done on those personal laptops, I think a magistrate judge could infer that the hiring to which the application refers would've involved an on-line submission of an application, that there was a good chance of that. And if that was done, it was done from a personal device.

And whether I would say that all this constituted probable cause, I think given deference to the magistrate judge and asking

whether the magistrate judge was arbitrary, I find the magistrate judge wasn't arbitrary in that regard.

You know, and I do think it's relevant, although certainly not dispositive. And, again, crediting Mr. Fletcher's argument that, you know, there's only so far you want to take an agent saying this, but I think it is relevant, and it can be considered, and a magistrate judge is allowed to take into account the agent's statement that, well, if you're doing an identify theft and computer fraud, there is a good chance that you are -- well, let me state the particular statements from the affidavit of what the person really said.

Paragraph 26 of the search warrant affidavit: "Individuals who engage in criminal activity, including the target offense, used digital devices to access websites to facilitate illegal activity and to communicate with co-conspirators on-line."

I think there are two things there. Communicate with co-conspirators on-line is part of it. And as I mentioned, you know, a

magistrate judge could draw an inference that there was a good chance that there was a co-conspirator and then take into account the agent's statement that if there's a co-conspirator, devices could be used to communicate with them.

The second piece of this is using digital devices to facilitate illegal activity. And one easily inferrible instance of that here would be this notion that, for example, in our case, digital devices were used to submit an application under the name of a victim whose identity was stolen.

So I do find, given the deference to the magistrate judge, that there was probable cause of the nexus.

Now, then we have the issue of Leon. So-called good faith exception, which, you know, the terminology tends to indicate this is all about subjective good faith. For the most part, it's more an objective inquiry, but we call it the Leon good faith standard. And this is an area where the law is just not very good in the Sixth Circuit for defendants. It's just the

reality.  So I'm going to read from Christian. You know, it's not a very old case, and it's an en banc case.  So this is a good case to look at if you're in the Sixth Circuit.

So here's what this says.  Reading from Christian.  "Under Leon, the exclusionary rule does not bar from admission evidence seized in reasonable good faith reliance on a search warrant that is subsequently held to be defective.  If somehow the affidavit at issue here could be deemed insufficient to establish probable cause, then this is a case in the very heartland of the Leon exception.

"Contrary to Christian's argument, the affidavit was not, quote, bare bones, end quote. We reserve that label for an affidavit that merely states suspicions or conclusions without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge.

"To further describe the bare bones standard is to show why it does not apply here. We have said that to be considered bare bones, an affidavit must be so lacking in indicia of

probable cause as to make an officer believe in its existence objectively unreasonable."

"In United States vs. Williams, 224 F. 3d. 530, Sixth Circuit, 2000, we describe how woefully deficient an affidavit must be before it meets this standard."

Then quoting from Williams, Christian writes: "An example of a bare bones affidavit is found in Gates, 462 U.S. at 239, where the Court said, A sworn statement of an Affiant that he has caused to suspect and does believe that liquor illegally brought into the United States is located on certain premises will not do.

"Another illustration was taken from Aguilar vs. Texas, 378 U.S. 108, that, quote, An officer's statement that Affiants have received reliable information from a credible person and believe that heroin is stored in a home is likewise inadequate, Gates 462 U.S. at 239.

"Thus, a bare bones affidavit is similar to, if not the same as, a conclusory affidavit. It is one which states only the Affiant's belief that probable cause existed."

Then Christian continues:

"Although one can split hairs with the affidavit, in this case, it is impossible to deny that it contained factual allegations, not just suspicions or conclusions."

Now, that's a tough standard for Defendants to get around. It's very leaning toward the Government, and I do think a good faith exception would apply here.

I did want to note regarding Leon. You know, the way Leon works, you know, you can have up to four different ways -- four different ways in which the good faith exception would not be applicable, and I'm reading from U.S. vs. McLane. Reading it verbatim it says here:

"In particular, the Leon Court explains suppression is appropriate if, one, the magistrate judge was misled by information in the affidavit that the Affiant knew was false or would've known was false except for his reckless disregard for the truth.

"Two, the magistrate abandoned his judicial role or neutrality.

"Three, the warrant was so lacking in indicia of probable cause as to render official

belief in its existence unreasonable; or,

"Four, the warrant was so facially deficient that it could not reasonably be presumed valid.

"We agree with the Government that none of these factors is present here."

I take, really, if you're the Defendant here, you are really focusing on the third and fourth of these. The warrant was so lacking in indicia of probable cause as to render official belief in its existence unreasonable.

And what I was just reading from Leon, I think, addresses that argument. It's such a lenient standard that the Court cannot find that the warrant was so lacking in indicia of probable cause as to render official belief in its existence unreasonable.

Then the other one is that the warrant was so facially deficient that it cannot reasonably be presumed valid.

To the extent there's a separate argument here, it would be along the lines that, look, the executing officers should've been able to look at the warrant and see it's just too broad.

I can't find that to be the case because I do think that the overbreadth challenge, based on a lack of probable cause of a nexus between the crimes of -- under investigation and personal devices, given that that argument fails, I don't know how an officer would know that it could not be reasonably relied upon even if the nexus was lacking.  I just don't know what it was about the face of the warrant that would tell an executing officer that there's something facially deficient about this warrant.

So, alternatively, I find that a good faith exception is applicable, and, therefore, the motion is denied with respect to the premises warrant.

And I say that while acknowledging some things Mr. Fletcher is saying.  I mean, you know, you would not say that this affidavit, which I don't have to decide this, but I think it was intentionally done to be pretty -- Government keeping some information pretty tight to the vest, and counsel know what this case is about.  I'm sure they could -- particularly Defense counsel is probably in the same position

as the Court could imagine why the Government's -- the point of drafting an affidavit, keeping some cards close to the vest, they want to say less rather than more given the nature of the investigation, and we all could understand that.

I think the result was an affidavit that was a little thin. It was. Mr. Fletcher's got a good point. But I do think that there was enough there given deference to the magistrate judge to affirm that probable cause determination, and then also to -- certainly enough there to defeat the exclusionary rule based on the application of the good faith exception.

All right. Let's talk next about the Discord warrants. The first thing I want to note is that -- on the Discord warrant, we have one for what I would call the Yang account, and then the one I would call the Defendant's account.

I would note as a preliminary matter that I do agree with the Government, that what is called Fourth -- so-called Fourth Amendment

standing is lacking for the Defendant, and here's why. If you look at the situation, it's a little bit strange in this sense: If you have two different accounts that may contain the same messages, to the extent there are messages between owners of one count and the other, the content, maybe not the exact metadata, but the content of the message is going to be the same in the Defendant's account and the Yang account. And, you know, as that message sits in the Defendant's account, he has a reasonable expectation of privacy, and thus has what we call Fourth Amendment standing, which is different from Article III constitutional standing, by the way.

But that doesn't mean -- and I think Defendant would like for it to mean -- and I understand why -- that the same content, which when it sits in the Defendant account, Defendant's account, is definitely deemed something which the Defendant has legitimate expectation of privacy.

I can't find that as the same message -- understanding it's the same message, but when it

sits in a different place in a different form, when it sits in Mr. Yang's account, even though it's the same message, I don't find it's the same result, and I can't find a substantive expectation of privacy in a message that sits in another person's account. As it sits in the other person's account, you don't have a reasonable expectation of privacy, because you know you have no control over that. There's no reasonable expectation of enforceable confidentiality on that same message as it sits in someone else's account. The person could choose to disclose whatever they want. You have nothing to say about it.

And, you know, to speak for myself, but I think that this is something that would go for other Americans, you know, and maybe you have a reasonable expectation of privacy in your own email account, but I think, objectively, Americans realize that you had sent an email message into someone else's account, now you're taking your chances about full disclosure. You don't know what's going to happen to that.

And you got no guarantee of privacy, and

for all you know, the person can do whatever they want with it, and I think that applies here.

As to non-message related content in Mr. Yang's account, I don't understand. I don't see a basis as to why the confidentiality of that information, the privacy of that information is something in which Mr. Knoot has a cognizable stake.

So I would note, as sort of an alternative basis, that as to the information in the Yang account, there's a lack of standing, and the motion to suppression needs to be denied on that basis alone.

Now, let's look at the other challenges to the Discord warrant, and I will assume that, you know, that there is standing. At this point going forward, that there's standing as to both accounts that Mr. Knoot has. The first argument is that suppression is warranted because the information used to obtain the Discord warrants were -- was obtained illegally via the premises warrant, and the Court notes that -- I do understand that argument, sort of a fruit of the

poisonous tree kind of argument. But the notion is that the Discord warrant is tainted if for no other reason by the fact that it was obtained based on information in the affidavit to obtain the warrant that was obtained illegally from the invalid premises warrants. And, obviously, based on my earlier conclusions, I'm in a position where I need to reject that argument, and I do.

I do think there's probably an alternative basis of -- though rejecting it, and it is something that comes from McLane. The general idea in McLane, which I had cited earlier, 444 F.3d. 556, Sixth Circuit case from 2005. McLane deals with a situation where a search warrant contained information -- that included information obtained from an earlier Fourth Amendment violation.

Now, in McLane, the Fourth Amendment violation was not the obtaining of information pursuant to an invalid warrant. It was information obtained through an invalid warrantless search. But, you know, otherwise, you know, it's a similar situation here.

The claim is, Hey, this search warrant is invalid because it contains information from -- obtained via an earlier Fourth Amendment violation.

And the Court in McLane does a survey of cases to address the issue of whether the good faith exception to the exclusionary rule can apply in a situation in which the affidavit supporting the search warrant is tainted by evidence obtained in violation of the Fourth Amendment.

And what McLane says is, Well, you know, let's say that the warrant is tainted, because it does have this information obtained by an earlier Fourth Amendment violation. In some situations, the taint is not fatal because the good faith exception can apply. And here's what they say:

"We conclude that this is one of those unique cases in which the Leon good faith exception should apply despite an earlier Fourth Amendment violation.

"We find that White's statement of the rule in Leon" -- and the reference there is to an

earlier case.  See if I can find it.  United States vs. White, 890 F.2d. 1413.  Eight Circuit case, 1989.

McLane wrote:  "We find White's statement of the rule in Leon particularly instructive. Evidence seized pursuant to a warrant, even if, in fact, obtained in violation of the Fourth Amendment is not subject to the exclusionary rule if an objectively reasonable officer could've perceived the seizure valid.

"The Court in White refused to apply the exclusionary rule because the facts surrounding the initial Fourth Amendment violation were close enough to the line of validity to make the officers believe in the validity of the warrant objectively reasonable."

You know, here, I would say -- you know, let's say my earlier analysis was wrong, and that for some reason there was a Fourth Amendment violation due to me having to say that the magistrate judge arbitrarily exercised her authority in finding probable cause of a nexus. If I did say that, then the question becomes, Well, does that taint necessarily mean that the

Discord warrant is tainted, or can a suppression remedy for the Discord warrant be denied on the basis of Leon?

And I think in a case like this, the answer is, Well, if I was wrong, we would say that there was this Fourth Amendment violation. I think the case would be close enough to the line that an officer executing the subsequent warrant could be deemed to rely on it in good faith.

So that's an alternative basis of rejecting the -- you know, the suppression of the evidence from the Discord warrants based on an alleged taint.

Getting to the merits of the Discord warrant. Here's what I wanted to note. If we look at what the argument is as stated, here is what is written. Page 1 of the motion to suppress. And the warrant is permitting law enforcement to access record from Discord, quote, the Discord warrants, end quote, are also intolerable because, one, law enforcement relied on tainted information; namely, information discovered by the illegal search of Knoot's computer to procure it. A poisonous tree

problem.

And, two, like the device warrant, it authorized law enforcement to indiscriminately access every inch of data associated with Knoot's Discord account, including, for instance, private messages bearing no relevance to criminal behavior and which were sent or received long before law enforcement even suspected that Knoot had committed a crime.

Here's what I would note. I've already resolved the first of those arguments.

The second argument, to me, I wasn't entirely sure whether it was a particularity argument or a reasonableness argument that there was a violation -- somehow there's a violation of the -- and I took it to be, sort of, really a -- I think there really was a particularity argument. But, you know, to the extent that there was a reasonableness argument that was different from the particularity argument, I didn't see a reasonableness argument developed.

Regarding the particularity argument, I'm going to reject it, and here's why. I do think that there is an argument that this could have

been more narrowly tailored in particular sentences; in particular, let's say regarding date ranges. I could see that argument, but I didn't really see the argument develop from the Defense side as to where the line is.

How do we know that, you know, under the case-specific examination of particularity that's required, as I mentioned from my citation of U.S. vs. Greene earlier, how do I know that more tailoring was required for this to apply -- for this particular argument to have merit?

How do I know more tailoring was required and how much tailoring?

And understanding that the affidavit doesn't do a great job of establishing probable cause as to, you know, let's say earlier time periods than the events alluded to in the affidavit, and that messages from any time period were covered. Understanding the potential issues there, how do I know that, under the circumstances here, this needed to be more narrowly tailored. And, you know, I didn't see that argument developed and didn't have a good sense about what the principles were that

sort of governed that determination.

By the way, I wanted to note specifically, I've already relied on the good faith exception in rejecting an overbreadth challenge.

Usually we think of Leon as applying to challenges based on lack of probable cause.

As I mentioned, I think our overbreadth challenge to the premises warrants really was, in essence, a challenge to probable cause of the nexus, so for that reason Leon applies because we all know it applies to challenges based on alleged lack of probable cause. But I did want to note multiple cases that reflect that Leon does apply to overbreadth challenges, and it applies to particularity challenges generally. And I wanted to point that out and cite a couple of cases, because you could imagine someone saying, Well, listen, you know, Leon doesn't support, you know, a warrant that's challenged based on particularity. Actually, the Leon good faith exception can apply to particularity challenges as well. And for that, I wanted to cite a couple of cases here.

One moment.

It occurs to me we ought to give our court reporter a break, and then we'll finish up my analysis here, and then we'll talk about the motion to continue. So maybe take about 10 minutes if that works for folks.

Anyone have court coming up?

MR. FLETCHER: No, Your Honor.

MR. KURTZMAN: No, Your Honor.

THE COURT: All right. Thank you. So we'll take about a 10-minute break.

So it sounds like all three counsel are good?

Okay. Then, you know, I'm not known for short explanations. And believe me, I painfully realize the downside. You know, I give longer explanations because these things matter to the parties, and I want to be clear why I'm doing what I'm doing.

Having said that, I know that ideally we'll finish up quick, and that's my objective. So we'll take about 10 minutes and finish up. Thanks.

(Break.)

THE COURT: All right. We're back on the

record. I was talking about the desire for me to site a couple cases with the notion that Leon in the good faith exception applies to challenges based on particularity and overbreadth.

The Court notes that, for example, a case like United States vs. Broughton, B-R-O-U-G-H-T-O-N, which is 2025 Westlaw 53140, Eastern District of Kentucky, January 9, 2025. Sort of points out that, you know, the Sixth Circuit -- excuse me -- the 11th Circuit may have some real questions about whether overbroad warrants are subject to Leon and really says the 11th Circuit, this looks like a real question.

But it notes that in the Sixth Circuit, Leon does apply to overbreadth challenges. And, you know, in terms of cases that do that, you would have a case like United States vs. Asker, 676 F. Appendix 447 at 462, 463. It's a Sixth Circuit case 2017.

For example, you see this quote, "In any event, as the District Court noted, even if we were to find that the warrant was

constitutionally overbroad, the good faith exception would still permit the introduction of gathered evidence."

So in Asker, the Court says, "As the alleged overbreadth is neither apparent on the face of the warrant nor the result of intentional misinformation, reliance upon it in the search of Happy's Pizza's corporate offices was reasonable, and a good faith exception is applicable."

One more example of this would come from -- two more examples. Richards. I cited Richards earlier, and here's what Richards says at page 542. "Moreover, for the sake of argument, were the warrant overbroad, we hold in the alternative that suppression of the evidence is not required under the Leon good faith exception."

Then one final example. Well, I suppose that that's probably adequate. Yeah, those three will, I think, do the trick.

And I did want to specifically address whether Leon applies to particularity challenges in the form of overbreadth challenges.

Now, getting back to the device warrants issue. You know, I think -- if you look at the way the challenge is framed, like the device warrant, it authorized law enforcement to indiscriminately access every inch of data associated with Knoot's Discord account, including, for instance, private messages bearing no relevance to criminal behavior and which were sent or received long before law enforcement even suspected that Knoot had committed a crime.

I'm going to reject that there's a particularity problem here for two reasons. One, I share some of Mr. Fletcher's, you know, concerns that it's pretty broad, but I just don't see a standard set forth that the standard was violated in terms of, well, you're allowed to ask for this, but, you know, you're cut off from asking for this. Under the case-specific circumstances, the crime under investigation, I just -- I can't say that based on this record and the argument that I've received.

I think the other thing is I can't find that what the Government did here was asked for

every inch of data associated with Knoot's Discord account.

I would say that Mr. Fletcher is right, that as to the particular categories of information from the Discord accounts that were asked about, there didn't appear to be limited language. Mr. Fletcher is right about that. But that is a little different from saying that every piece of data was asked for because there could be categories that just weren't covered.

And, in fact, Mr. Nicosia, I can't sort of take his representation as accurate, but it's an example of what I'm talking about when I say I don't know that it asks for everything, rather than trying to be more tailored than that, than asking for just give us everything in your account.

There could be additional things outside the categories that were asked for even if the categories themselves are sort of framed in an untailored manner.

To the extent the categories are framed in an untailored manner in terms of subject matter or date, I don't have a basis for saying that

it's unreasonable under the circumstances. So for that reason, I reject the particularity challenge.

One final thing.

Now, right now I'm going to go back to the premises warrant.

Here's the statement of an argument referenced on page 1 of the motion to suppress that maybe is an additional kind of particularity challenge different from the one that I had addressed earlier, which I was careful to frame as an overbreadth argument that overlaps with and really is the same argument that there was no probable cause of nexus between the crimes under investigation and the personal computers.

What I'm about to read could indicate an additional assertion by Defendant in the nature of a particularity challenge. So if you look at this, here's how it's written on page 1 of the motion to suppress. It allowed law enforcement to review and make copies of all data found on any device discovered in Knoot's apartment irrespective of whether the device or data has

or had anything to do with the crimes under investigation, a particularity problem.

As I've indicated, part of what is being complained about there, to me, is a lack of probable cause of nexus. But I did want to say that just the way the sentence is written, there could be something else within that complaint that -- and part of why it's hard to figure out what exactly the assertion is, we have to keep in mind that there is this circularity in the premises warrant. It authorizes search of premises, then seizure of the computers, then searching of the computers, and then in the Government's review, retention of certain data; in other words, seizing again, you know, long-term seizing of data from the search of the computers. The secondary search of the computers.

That's kind of circular, and, you know, I'm not sure where in the process the particularity argument is made here to the extent a particularity argument is made beyond the one I addressed about probable cause as the nexus.

It allowed law enforcement to review and

make copies of all data found on any device discovered in Knoot's apartment irrespective of whether the device or data has or had anything to do with the crimes under investigation.

Here's what I would say.  I suppose in there, there's this notion that an additional particularity problem is that in allowing what I'm calling the secondary search of computers that was authorized with respect to computers found in the primary search, which was the search of the apartment, that in allowing this search, this secondary search of these personal computers, these personal devices, the warrant needed to put some kind of limitations on this. It needed to somehow cabin agent's search more than it did, and it also needed to cabin the agent's ability to sort of keep and make copies of whatever it is they found when they did search.

So it needed -- so in authorizing a search of personal devices found pursuant to the search of the apartment, it needed to put limitations on the kind of searching of those personal devices that could be done and then put

limitations on the ability of agents to, quote,

make copies, which is how Defendant puts it, of

the information seen pursuant to that search.

I get the nature of the particularity

challenge. I do think that -- and I looked

through the brief multiple times. I was trying

to see where this argument was really developed

as to what, really, the standards are for when a

warrant fails for particularity for not putting

these kinds of limitations in place. And I just

wasn't seeing it.

The Government, to the extent that this was

addressed -- I thought it was addressed more by

the Government, and I thought that the

Government's citation to Richards, which is at

page 11 of the Government's brief, I really

think it shows why the Government would prevail

in any event.

The end of the quoted material there from

Richards by the Government says, "In the end,

there may be no practical substitute for

actually looking in many, perhaps all folders,

and sometimes at the dockets contained within

those folders. And that is true whether the

search is of computer files or of physical files.  It is particularly true with image files."

So that is to say -- if I'm to say, look, this needed -- the search needed to have boundaries, and the warrant needed to put them in there, I'm not sure that that's true.  I didn't see case law that would support that, and I didn't see how the circumstances here were shown to be a situation where there needed to be these sorts of boundaries on what could be searched and then what could be seized in the sense of being copied pursuant to the search.

So to the extent there's that additional particularity challenge, I'm rejecting that one also.

All right.  So, in summary, I wanted to note -- well, and I'm going to say one final thing about the latter challenge I was addressing, to the extent it was a challenge.  I think Leon would apply there as well.

Suppose there was a particularity problem, and that there's a Fourth Amendment violation for lack of particularity based on the warrant

not cabining the scope of the search or the scope of what could be copied.

There again, I think the Leon good faith exception would apply. I just, you know, haven't spent a lot of time myself looking at these issues, trying to figure out: Is there a particularity problem? If so, what is it? What case law is out there? How does it apply here? There's no way, in my view, an agent would be expected reasonably to know that the warrant was defective for lack of particularity.

So for all those reasons, I tried to cover the arguments and the assertions, as best as I understood them. And having done so, denying the motion to suppress in full.

I say that understanding some of the concerns that Mr. Fletcher has raised, but I think the law and the record in this case requires that each of the assertions be denied.

So Mr. Fletcher will be disappointed, and his client, in the result, but I did want to ask whether he or the Government had any questions about what I said.

The objection, of course, to the Court's

ruling is preserved by the Defendant.

Any questions about what the Court has just announced?

MR. FLETCHER: No, Your Honor.

THE COURT: Okay. Thank you, Counsel.

All right. Let's take up the motion to continue. I'm just going to read verbatim the crux of the motion to continue.

The first thing to know is Mr. Knoot notes that he's really been working on the case. And then his counsel says, "As the Defense team reviewed the discovery, the undersigned became aware that the Defense did not have copies of the forensic imaging of the victim laptops. Counsel was concerned about this. In its notice of expert witnesses, the Government noted that it anticipated its witness, Andrew McDole, would offer expert testimony in general terms and/or as applied in this case regarding the forensic imaging of data from computers, including the desktop computer seized from the Defendant in this case."

And then it continues: "On June 26th, 2025, the undersigned emailed the Government to

request copies of the forensic imaging of the victim laptops. After a week or so of email exchanges and telephone conversations with the Government, the undersigned was informed that he could come to the FBI's field office and review the material. The undersigned has not yet had the time to review that material due to other work related deadlines.

"On June 25th, 2025, the United States disclosed an additional batch of discovery to the Defendant.

"Just last week, the Government disclosed another batch of discovery on July 16th, 2025. This batch contained numerous files related to one of the alleged victim companies, and nearly all the files are very relevant to the facts of this case.

"Undersigned has attempted to review all the documents, but because of the amount, undersigned has been unable to review all the discovery and thus has been unable to review it fully with Mr. Knoot."

So, in general, you would say, Mr. Knoot is saying, Hey, I haven't had an opportunity to

look at the victim laptops, which the Government seems to note are not the subject of a forensic imaging. It's something that could be viewed. The information could be viewed, but there isn't a copy of the forensic imaging that he could have or that's available to review. But he can look at what's on the victim laptops, even if it's not a forensic image as such.

And then Mr. Fletcher is saying, "I got additional discovery on June 25th, and I got additional discovery on July 16th. I need more time to review this new discovery."

The Government's response is basically along the lines of, Well, we weren't late in producing any of this. Plus, it's not that voluminous, and counsel does have time to review it, you know, with the notion being that at the time the motion to continue was filed, there was still three weeks before trial.

I think I have summarized the parties' positions on this.

So I'll allow each side to speak on this, and to the extent I've misunderstood someone's position, you can let me know. But you can also

say anything else you want on this issue.

Mr. Fletcher?

MR. FLETCHER:  Yes, Your Honor.  Can you hear me now?

THE COURT:  Pardon me?

MR. FLETCHER:  Can you hear me?

THE COURT:  It's a little dicey, but we'll see how it goes.

MR. FLETCHER:  Okay.  I'll try to talk a little slowly.  So just to kind of, like, give you some clarity on what happened.  So I had previously reviewed all the discovery prior to June 26th, which is the date that I requested the transcripts and things like that from the victim laptop.  Mr. Nicosia and I had conversations about that.  I specifically asked him this is on June 26th about the images of the victim laptops.  And so on that same day, there were multiple emails between the both of us with it ending in Mr. Nicosia telling me that the imaging would -- he told me the hard drive would be available at the FBI's office, the field office.  And I think we had a conversation on the phone after that.  That was probably the --

maybe a couple weeks later, where he informed me that there wasn't actually imaging of the victim computers. There was imaging of the personal device, Mr. Knoot's personal device. Again, the only reason I had even thought about the forensic imaging of those computers was because of what was in the notice of expert testimony.

But either way, Your Honor, I think that since Friday, when I filed the motion, we've gotten three additional discoveries. And I think it's just kind of unfair for the Government to say, Well, it's not that much, because even after they filed the motion, there was more discovery that came as if I'm just supposed to drop everything else that I have going on and review all that discovery, not just review it by myself, review it with Mr. Knoot.

I talked to the Government about this before I filed the motion because I figured that this would probably be an issue. You know, the pretrial conference at this point is Monday, and as far as I'm concerned, I don't think the Government knows if they're going to get any more discovery because back in May, they told

the Court specifically that they didn't have any discovery, that their review was complete, and there wasn't going to be any more discovery coming. I think we've gotten probably six disclosures since that time. And I just want to make sure that, you know -- and I'm not -- I talked to Mr. Nicosia. I'm not stalking him for things that he may have gotten late from the witnesses, but, you know, quite frankly, that's just not our fault.

Everything that we've received, particularly in July, everything that we've received is pretty relevant to our defense. And so it's more than just looking at the documents and going, oh, you know, I reviewed this. You know, I want to try to figure out how it's going to work in our defense.

And I don't know if we're going to get any more discovery, but, like I said, it's just been a number of things that have come up since then, just since the motion was filed Friday.

THE COURT: All right. Thank you, Mr. Fletcher.

All right. If the Government wants to

respond.

MR. NICOSIA: Yes, Your Honor. This is Mr. Nicosia. So I would first say that I appreciate all the communication with Mr. Fletcher. We have, you know, gone back and forth, and I think tried to work things out. And it does appear that there was, you know, confusion between us in our communications about the differences between the Defendant's laptop, which was imaged, and the victim's company laptop, which were not imaged but are available. So that is a, sort of, a good faith misunderstanding between the two of us, and I appreciate that.

Other than what we have flagged in our motion, we'll stand on our response there.

The only thing I would note for the Court is we did receive a note from a victim company yesterday letting us know that they may intervene or may seek to intervene despite our efforts to work things out in the form of a stipulation on referring to the parties. Anonymously, one of the victim companies doesn't feel as that resolution was satisfactory despite

the fact that the Government and the Defense do. So I note that here just for the Court's visibility, as I imagine that may play a factor in the Court's thinking as it goes through its ruling here on the motion to continue.

THE COURT: All right. One moment, Mr. Nicosia. Let me ask you this: First of all, kudos to both sides for reaching that stipulation. I thought it was appropriate because it gave both sides what they needed and enabled the Court to have a comfort level that the trial would be done appropriately.

And I would note if a victim company doesn't think it's adequate and believes it has grounds to intervene, hopefully it will sort of do that soon so I can take it up. I have a lot of respect for what the parties did here, but -- and I guess I would have to consider anything from the victim company.

Now, having said that, Mr. Nicosia, would it be possible that if I was to grant an objection to the stipulation, that that could sort of overturn certain preparations on the part of both sides as to how to get ready for

this trial?

MR. NICOSIA: Yes, Your Honor. I think it would. I do think that overturning the stipulation would certainly challenge our efforts to prepare as we, you know, seek to appropriately, you know, redact or otherwise prepare -- you know, prepare for trial. So I would agree that that could hinder our preparations. And it certainly is the Government's position that we will -- kind of regardless of what is in place, our intention is to match those names, you know, in order to preserve and protect the victims here.

So I think it would -- overturning that stipulation, I think would have that -- would potentially have that effect.

My understanding, Your Honor -- and, again, I won't -- this is what was communicated to me. I do not know what ultimately the victims would argue, but my understanding is that one of the victim companies is concerned about having their information, you know, shared with prospective jurors. And jurors, their concern I get. And, again, now I'm sort of making an argument for

them, that I don't think, you know, without having the benefit of knowing what they'll say, but I think that they are concerned potentially about leaks and so on and so forth. But in my conversations with Mr. Fletcher, I understood that he had some sincere concerns about how he could adequately represent his client, beginning with voir dire. And I take those arguments seriously. I think he's right, that if he wants to properly pick a jury in this matter, that that's going to be, you know, among other things, ask the witnesses whether or not they have conflicts is going to be important.

So, just to be clear, I think that the Government is very comfortable with the stipulation that we entered into and the resolution there.

But this is sort of my understanding of what the victim companies have communicated with their concerns.

THE COURT: All right. A couple things. Does the Government believe that under the Crime Victim Rights Act, that the victim companies are actually victims for purposes of having those

rights, as opposed to victims in a more general sense? Are they victims of the crimes of -- that are charged in the indictment?

MR. NICOSIA: Yes, Your Honor. We would view them in that manner. I believe we said as much in our motion in limine.

THE COURT: Okay. All right. So I definitely want to hear them out and make sure that their rights aren't violated. And so there is that piece. We'll hear what they have to say.

I understood there were two rationales for sort of keeping their identities secret. One, it's kind of embarrassing. And if you're Mr. Fletcher, you're probably rolling your eyes a little bit, like, Well, tough luck.

I don't speak for Mr. Fletcher, but, Oh, it's embarrassing that you got duped? Well, that's on you, man.

That might be Mr. Fletcher's view, but that's rationale number one.

Rationale number two is, well, there are hostile foreign actors out there, and, you know, the less information they hear about anything

having to do with anyone, particularly individuals associated with the company, the better.

Fair to say those are the two rationales?

MR. NICOSIA: Yes, Your Honor, fair to say.

MR. FLETCHER: Yes, Your Honor.

THE COURT: Okay. All right. Now, regarding discovery. It seems to me, Mr. Nicosia -- hold on one second -- that when discovery goes over, it goes over under one of four rationales. A, Rule 16. B, Jencks. C, Brady, which could include Giglio. And, four, just because. Just because. What the heck. You know as sort of a catch all. Well, we have it, so we'll send it over just in case. The rationale is something probably related to Brady and Giglio. You don't want to be accused of, you know, a Brady violation, although you don't particularly think that anything you're handing over fits in any of those categories.

The information we're talking about here recently, recently disclosed, what kind of information was this, and what was the rationale for turning it over?

MR. NICOSIA: Your Honor, this is information that was provided to us by victim companies. As we have spoken to them, they've identified additional information, additional documents that they have that we feel would be responsive to the trial. And so we would ask them to produce them, and so they have. And as they have come in to us, we have turned them over to Defense. You know, I think that the most logical grounds for turning them over is Rule 16 and the documents being material to the Defendants in preparing his defense. I don't view those documents as, you know, including any sort of Brady or Jencks material or anything like that, though I suppose to the extent the victim company represented will testify -- definitely a Jencks argument there.

But in my view, the most logical reason for producing the rule under which we are required to produce them is Rule 16, and that the documents is arguably material to the preparation of the Defense.

THE COURT: Okay. A phrase under Rule 16 that is maddingly undefined, and recently I

looked at some case law, trying to put some definition on it, but it strikes me as, you know, pretty ambiguous, but I understand what you're saying there.

Okay. Mr. Fletcher, do you agree with the Government's assessment that to the extent they addressed the recently disclosed information, that it's really no big deal, and that it's -- it doesn't take that long to review, and the Government provided some detail about that?

MR. FLETCHER: No, Your Honor. I think it's pretty material to our defense. Everything was related to -- I would assume that it would be material and relevant to the Government's case in chief also. It was all related. Because it came from the victim companies, they were all related to kind of just the employment of -- let's just say the batch that I was able to go through, and that was the batch that came through on July 16th. One of the victim companies sent a lot of stuff, which is a lot of stuff that we hadn't seen obviously. It's completely related to building the case. And, like I said, I mean, I haven't even gotten

through all of that. And then we got more discovery, and I think the -- I kind of perused the extra discovery that we got in the last couple of days, and it looks like employment records also from a couple of the other victim companies.

Like I said, for just our purposes, I would just like to have time to actually review it and determine how it's going to play a part in our defense.

THE COURT: If I don't give you a continuance, is it your view that you'll be unprepared for trial and that Mr. Knoot would be able to say, "I did not receive effective representation"?

MR. FLETCHER: At this point, yes, Your Honor. He knows that the -- I mean, he knows that I just got the discovery. He hasn't even gotten all of the discovery. Like when we get it, our folks process it, and we send it to all of our clients. But, I mean, like I said, one of the disclosures was yesterday, and so he hasn't even seen that yet.

Mr. Nicosia and Mr. Kurtzman know that I

would be, you know, ready to get this trial out of the way, and I've really been trying to prepare, even on the tight timeline I feel like we've had based on this type of case. But right now -- and maybe the Government can answer this. I don't know if they could, but I don't know if other discovery is going to come after this because they didn't even know that discovery was coming until it came.

THE COURT: All right. Mr. Nicosia, do you want to say anything about that or anything else? And then I'm going to map out a plan for us.

MR. NICOSIA: No, Your Honor, nothing further.

THE COURT: Okay. Here's what I'm going to do. Obviously, there's also, amongst other things, I think on the Defense side, you need to digest the Court's decision here. I'm sure Mr. Fletcher was aware that this is a possibility, but he needs to maybe circle back around with his client after that and make a further assessment.

Here's what we're going to do. On this

motion, I'm going to allow parties to talk on their own end with each other, hopefully amongst themselves, and the Government with the victim company that they've been in touch with, and we're going to have a decision. After those discussions, I want to hear where parties' heads really are, and maybe -- let's get a time in the next 24 hours.

Hold on one second.

(Off the record.)

THE COURT: All right, Counsel. We'll resolve this after, you know, the further discussions that I've encouraged here, including the possibility of, you know, sort of additional things needing to go over, to transcend from the Government to the Defendant. Whatever you all need to talk about. We'll resolve this tomorrow afternoon, because I know counsel need to know, but I think those discussions will help. We can't do this on our end until 3:30, but can counsel be available at 3:30 for a resolution tomorrow?

MR. KURTZMAN: Tomorrow, Your Honor?

THE COURT: Yes, sir.

MR. KURTZMAN: Yes, Your Honor. I can be available. I would also ask Your Honor maybe to facilitate those discussions --

THE COURT: Yeah.

MR. KURTZMAN: -- if we could get from the Court -- if there's potential places that this trial could land, if the parties were either to come to an agreement, or the Court were to grant Mr. Fletcher's motion to continue. If there's places where this trial could land, if the parties could have those to sort of work through discussions, that might be helpful.

THE COURT: That's a good suggestion. I was thinking about recommending something along those lines.

Standby one moment, Mr. Kurtzman.

(Off the record.)

THE COURT: Here's what we'll do. Within the next hour, Ms. Jackson will email both counsel to sort of start that discussion on our end, potential dates if this was to be moved.

The calendar looks a little bleak around here, but, you know, if anyone can accommodate anyone, it's always Ms. Jackson.

So hopefully that will be the case. So she'll reach out first, and feel free to have a full dialogue by email.

And if anyone wants to suggest at some point a three-way phone call with her to facilitate discussion, feel free to do so. But we'll start out with email communications with Ms. Jackson.

All right. Does that work for everybody?

MR. FLETCHER: Yes, Your Honor.

MR. KURTZMAN: Yes. Thanks, Judge.

THE COURT: All right. Thank you.

MR. NICOSIA: Yes, Your Honor.

THE COURT: Thank you.

We're going to get out an order that's pretty brief, noting that, for the reasons stated, the motion to suppress is denied in its entirety. Of course, the Defendant's objection is preserved on that front. It will be a short order just saying that, yeah, for the reasons discussed.

And then -- there will be a separate order that we'll issue, just a short scheduling order, about the 3:30 conference call tomorrow.

All right.  Anything further we need to discuss pending reconvening 3:30 tomorrow?

MR. KURTZMAN:  No, Your Honor.

MR. NICOSIA:  Nothing from the Government.

MR. FLETCHER:  No, Your Honor.

THE COURT:  All right.  Thanks, Counsel.

We stand in recess.

(Hearing concluded at 11:50 a.m.)

CERTIFICATE

I, Richard D. Ehrlich, Official Court Reporter for the United States District Court for the Middle District of Tennessee, with offices at Nashville, do hereby certify:

That I reported on the stenotype shorthand machine the proceedings held in open court on July 30, 2025.

The proceedings in connection with the hearing were reduced to typewritten form by me;

That the foregoing transcript is a true and accurate record of the proceedings to the best of my skills and abilities;

This 26th day of August, 2025.


_____
Richard D. Ehrlich
Registered Merit Reporter
Certified Realtime Reporter